873 So.2d 168 (2003)
Michael J. ANDERSON et al.
v.
Mary Jean ASHBY, individually, and as personal representative of the estate of Jimmy Ashby, deceased.
1011740.
Supreme Court of Alabama.
May 16, 2003.
Rehearing Denied August 29, 2003.
Robert H. Rutherford, F.A. Flowers III, and Richard C. Keller of Burr & Forman, LLP, Birmingham, for appellants.
*169 B. Scott Shipman of Sherrill, Batts & Shipman, LLC, Athens, for appellee.
PER CURIAM.
Michael J. Anderson, American General Finance, Inc., and Merit Life Insurance Company appeal from an order denying their motions to compel arbitration in an action filed against them in the Limestone Circuit Court by Mary Jean Ashby. We affirm.

Background
On April 15, 1999, Mary Jean Ashby and Jimmy Ashby, her now-deceased husband, visited the American General Finance office located in Athens, Alabama,[1] to obtain a $2,000 loan to be secured by their automobile. The loan was to be paid over a period of three years. Mr. Ashby indicated on the loan application that his only source of income was "disability" and "soc. sec."; Mrs. Ashby indicated on the loan application that her only source of income was "disability." According to Mrs. Ashby, Mr. Ashby wanted to obtain credit-life insurance so that she would not have to worry about the payments on the loan in the event something happened to him. It is undisputed that Mr. Ashby agreed to pay $827.10 in order to purchase $5,000 of credit-life insurance during the term of their three-year note.
While at American General Finance's office, the Ashbys met with Michael Anderson, the branch manager for American General Finance; Anderson is also an insurance agent for Merit Life Insurance Company, an affiliate of American General Finance. Mr. Anderson acknowledges that, as a result of doing business with the Ashbys, he knew that Mr. Ashby was unable to read and write and that he could not sign his own name. Anderson also admits that he knew Mrs. Ashby was limited in her reading ability.[2]
Mrs. Ashby claims that she and Mr. Ashby asked Anderson to explain the loan documents because they were unable to read and understand the documents. Additionally, the operating procedures of American General Finance applicable to customers who are blind or who cannot read require the company's representative to explain the documents to the customer before obtaining the customer's signature.
Anderson alleges that he explained the loan and credit-life insurance documents to the Ashbys. Anderson claims that, in accordance with American General Finance's operating procedures applicable to illiterate customers, he wrote at the bottom of each document involved in the loan transaction "THIS DOCUMENT EXPLAINED AND UNDERSTOOD BY THE BORROWER." According to Anderson, he then had the Ashbys sign the documents. Mrs. Ashby denies that the documents she executed bore any handwritten statements when she signed them.
The note and security agreement executed by the Ashbys on April 15, 1999, contained an arbitration agreement, which included the following provisions:
*170 "ARBITRATION OF CLAIMS AND WAIVER OF JURY TRIAL:
"Borrower(s) hereby acknowledge that the transactions evidenced by this agreement involve interstate commerce. Borrower(s) and Lender agree that, except as otherwise set forth in this provision, all claims, disputes, or controversies of every kind and nature between Borrower(s) and Lender shall be resolved by arbitration including (i) those based on contract, tort or statute, (ii) those arising out of or relating to the transaction(s) evidenced by this agreement, the disclosures relating to this agreement, the Federal Disclosure Statement, any insurance certificates or policies, any documents executed at or about the same time this agreement was executed or (iii) those arising out of, [or] relating to any other prior, proposed or actual loan or extension of credit (and the relationships which result from these transactions or any other previous transactions between Borrower(s) and Lender). Borrower(s) and Lender further agree that all issues and disputes as to the arbitrability of claims must also be resolved by the arbitrator.
"BORROWER(S) AND LENDER UNDERSTAND THAT EACH HAS THE RIGHT TO LITIGATE SUCH DISPUTES THROUGH A COURT, AND BORROWER(S) AND LENDER VOLUNTARILY AND KNOWINGLY WAIVE ANY RIGHT THEY HAVE TO A JURY TRIAL OR JUDGE TRIAL OF SUCH DISPUTES.
". . . .
"BORROWER(S) AND LENDER AGREE THAT THE ARBITRATOR MAY AWARD PUNITIVE DAMAGES ONLY UNDER CIRCUMSTANCES WHERE A COURT OF COMPETENT JURISDICTION COULD AWARD SUCH DAMAGES. HOWEVER, IN NO EVENT SHALL AN AWARD OF DAMAGES EXCEED FIVE (5) TIMES THE ECONOMIC LOSS SUFFERED BY THE PARTY. BORROWER(S) AND LENDER FURTHER AGREE THAT THE ARBITRATOR SHALL NOT CONDUCT ANY CLASS-WIDE PROCEEDINGS AND WILL BE RESTRICTED TO RESOLVING THE INDIVIDUAL DISPUTES BETWEEN THE PARTIES.
"Borrower(s) and Lender agree that, notwithstanding the foregoing, Lender retains the right to use judicial or self-help remedies (i) to repossess or foreclose on collateral or to enforce the security interests relating to this transaction, and (ii) to pursue collection actions against the Borrower(s) where the amount of the debt is $10,000 or less. The exercise of this right by Lender to pursue judicial or self-help remedies shall not constitute a waiver of Lender's right to compel the arbitration of any claim or dispute subject to this arbitration clauseincluding the filing of a counterclaim by Borrower(s) in a lawsuit filed by Lender.
"This arbitration clause shall be binding upon the assigns, directors, officers, representatives, employees, parent companies, affiliate companies, subsidiaries and successors of lender, and the administrators, assigns, executors, heirs and representatives of Borrower(s). In addition, the parties agree to submit to arbitration not only the foregoing claims or disputes against each other, but also all claims or disputes they have against (i) all other persons or entities involved with the transactions subject to this clause, (ii) all persons or entities who signed or executed any of the documentation subject to this clause, and (iii) all persons or entities who may be jointly or severally liable to any of the parties to this agreement regarding matters or *171 events relating to the transactions and documentation subject to this clause.
"Borrower(s) and Lender agree that if any provision of this arbitration clause is invalid or unenforceable under the Federal Arbitration Act, the provision which is found to be invalid or unenforceable shall be inapplicable and deemed omitted, but shall not invalidate the remaining provisions of this arbitration clause, and shall not diminish the parties' obligation to arbitrate the disputes subject to this clause."
(Capitalization in original.) Above the signature line on the note and security agreement is written "THIS DOCUMENT EXPLAINED AND UNDERSTOOD BY THE BORROWER"; on the signature line is an "X," presumably Jimmy Ashby's mark, and Mrs. Ashby's signature.
Included with the application for credit-life insurance submitted to Merit Life Insurance by Jimmy Ashby on April 15, 1999, was a separate, stand-alone document, on which was printed another arbitration agreement.[3] That arbitration agreement provided, in pertinent part:

"ARBITRATION OF CLAIMS AND WAIVER OF JURY TRIAL
"Merit Life Insurance Co. and I hereby acknowledge that the transactions covered by the Policy being applied for involve interstate commerce. We agree that all claims, disputes, or controversies of every kind and nature between us shall be resolved by arbitration including (i) those based on contract, tort, or statute, (ii) those arising out of or relating to the transaction(s) evidenced by a policy, the disclosures relating to a policy, any documents executed at or about the same time a policy was executed or (iii) the relationships which result from these transactions or any other previous transactions between us. Merit Life Insurance Co. and I further agree that all issues and disputes as to the arbitrability of claims must also be resolved by the arbitrator.
"WE UNDERSTAND THAT EACH HAS THE RIGHT TO LITIGATE SUCH DISPUTES THROUGH A COURT, AND WE VOLUNTARILY AND KNOWINGLY WAIVE ANY RIGHT WE HAVE TO A JURY TRIAL OR JUDGE TRIAL OF SUCH DISPUTES.
". . . .
"WE AGREE THAT THE ARBITRATOR MAY AWARD PUNITIVE DAMAGES ONLY UNDER CIRCUMSTANCES WHERE A COURT OF COMPETENT JURISDICTION COULD AWARD SUCH DAMAGES. HOWEVER, IN NO EVENT SHALL AN AWARD OF DAMAGES EXCEED FIVE (5) TIMES THE ECONOMIC LOSS SUFFERED BY THE PARTY. MERIT LIFE INSURANCE CO. AND I FURTHER AGREE THAT THE ARBITRATOR SHALL NOT CONDUCT ANY CLASS-WIDE PROCEEDINGS AND WILL BE RESTRICTED TO RESOLVING THE INDIVIDUAL DISPUTES BETWEEN THE PARTIES.
"This arbitration clause shall be binding upon the assigns, directors, officers, representatives, employees, agents, parent companies, affiliated companies, subsidiaries and successors of Merit Life Insurance Co. and my administrators, assigns, executors, heirs and representatives. In addition, the parties agree to submit to arbitration not only the foregoing claims or disputes against each *172 other, but also all claims or disputes they have against (i) all other persons or entities involved with the transactions subject to this clause, (ii) all persons or entities who signed or executed any of the documentation subject to this clause, and (iii) all persons or entities who may be jointly or severally liable to any of the parties to this agreement regarding matters or events relating to the transactions and documentation subject to this clause.
"Merit Life Insurance Co. and I agree that if any provision of this arbitration clause is invalid or unenforceable under the Federal Arbitration Act, the provision which is found to be invalid or unenforceable shall be inapplicable and deemed omitted, but shall not invalidate the remaining provisions of this arbitration clause, and shall not diminish the parties' obligation to arbitrate the disputes subject to this clause."
(Capitalization in original.) Above the signature line on this arbitration agreement was written "THIS DOCUMENT EXPLAINED AND UNDERSTOOD BY APPLICANT"; an "X," presumably Jimmy Ashby's mark, is shown on the signature line.
Although Anderson admits that he never received any training from American General Finance on how to explain an arbitration agreement to customers, he says that he explained the arbitration agreements to the Ashbys. Mrs. Ashby claims that Anderson never explained or mentioned to them the arbitration agreements contained in the loan and credit-life insurance documents. She also claims that she was within hearing distance of Mr. Ashby and Anderson during the entire closing and that Anderson never explained or mentioned arbitration to Mr. Ashby in connection with the credit-life insurance documents.
On December 2, 1999, Mr. Ashby died. Mrs. Ashby filed a claim for the death benefit provided under the credit-life insurance policy Mr. Ashby had obtained from Merit Life. Merit Life did not pay the claim; instead, it rescinded the policy issued to Mr. Ashby. Merit Life alleged that Mr. Ashby had answered the questions on the insurance application regarding his health inaccurately. Mrs. Ashby alleges that Anderson, who read the questions to them, never asked them any questions about Mr. Ashby's health.
On April 17, 2000, Mary Jean Ashby filed this action in the Limestone Circuit Court, as the personal representative of the estate of her deceased husband Jimmy Ashby, and in her individual capacity. Mrs. Ashby seeks compensatory and punitive damages as a result of Merit Life's refusal to pay benefits under the credit-life insurance policy issued in connection with the American General Finance loan.[4]
Anderson, American General Finance, and Merit Life each moved to stay the proceedings and to compel arbitration, relying upon the arbitration agreements contained in the note and security agreement and executed as part of the application for credit-life insurance. Mrs. Ashby opposed those motions to compel, asserting that the arbitration agreements were unconscionable and that they were obtained through fraud.
On January 22, 2002, after receiving briefs and conducting hearings, the trial court denied the motions to compel arbitration on the grounds that the arbitration agreement contained in the note and security agreement was unconscionable and that "fraud in the factum" had occurred *173 with regard to the arbitration agreement executed in connection with the application for credit-life insurance. On February 20, 2002, Anderson, American General Finance, and Merit Life moved, pursuant to Rule 59(e), Ala. R. Civ. P., to alter, amend, or vacate the trial court's order. On May 8, 2002, the trial court denied the defendants' Rule 59(e) motion.
American General Finance, Anderson, and Merit Life appeal, asserting the following claims: that the trial court erred and usurped the arbitrator's authority by deciding the threshold issues of arbitrability; that the trial court erred in concluding that the arbitration agreement included in the note and security agreement was unconscionable; and that the trial court erred in concluding that Mr. Ashby's fraud claim presented a question for the jury.

Standard of Review
In American General Finance, Inc. v. Morton, 812 So.2d 282 (Ala.2001), this Court recited the now familiar standard of review applicable to motions to compel arbitration:
"This Court reviews the [grant or] denial of a motion to compel arbitration de novo. Green Tree Fin. Corp. v. Vintson, 753 So.2d 497, 502 (Ala.1999); Patrick Home Ctr., Inc. v. Karr, 730 So.2d 1171, 1172 (Ala.1999). The party seeking to compel arbitration has the initial burden of proving the existence of a contract calling for arbitration and proving that the contract evidences a transaction substantially affecting interstate commerce. TranSouth Fin. Corp. v. Bell, 739 So.2d 1110, 1114 (Ala.1999); Sisters of the Visitation v. Cochran, 775 So.2d 759 (Ala.2000). `[A]fter a motion to compel arbitration has been made and supported, the burden is on the nonmovant to present evidence that the supposed arbitration agreement is not valid or does not apply to the dispute in question.' Jim Burke Auto., Inc. v. Beavers, 674 So.2d 1260, 1265 n. 1 (Ala.1995)."
812 So.2d at 284-85. Mrs. Ashby does not dispute the existence of a written contract evidencing a transaction substantially affecting interstate commerce; we need not consider those issues in this appeal.

Analysis
I. Did the trial court err and usurp the arbitrator's authority in deciding the threshold issue of arbitrability?
The trial court determined that the arbitration agreement included in the note and security agreement was unconscionable and therefore unenforceable. American General Finance and Anderson appeal, arguing that whether the arbitration agreement was unenforceable was an issue for the arbitrator to decide rather than for the trial court. We disagree.
The Federal Arbitration Act, 9 U.S.C. § 1 et seq. (the "FAA"), "binds us to faithfully apply general principles of Alabama contract law when considering a challenge to the validity of an arbitration agreement." Green Tree Fin. Corp. v. Wampler, 749 So.2d 409, 416 (Ala.1999). As Justice Lyons noted in his concurring opinion in Ex parte Dan Tucker Auto Sales, Inc., 718 So.2d 33 (Ala.1998):
"Alabama has long recognized the doctrine of unconscionability as a defense to enforcement of a contract. While Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), relegates challenges to the validity of a contract as a whole to the arbitrator, a challenge to the arbitration clause only is properly determined by the court."
718 So.2d at 43 (Lyons, J., concurring specially) (citation omitted). This Court reached the same conclusion in American General Finance, Inc. v. Branch, 793 *174 So.2d 738 (Ala.2000), a case almost identical to this one. In Branch, this Court rejected an argument identical to the one raised by American General Finance and Anderson in this case: that because the parties had agreed that issues of arbitrability were to be decided by the arbitrator, the trial court had no authority to address the issue of unconscionability. The Branch Court stated:
"`[A] determination that, by the terms of the arbitration clause, the arbitrator is to decide issues of arbitrability, does not end the inquiry.' `Where the attack is addressed to the arbitration clause itself, as opposed to the contract as a whole, the court, and not the arbitrator, resolves the issue.' Thus, the threshold `issue of unconscionability of an arbitration clause is a question for the court and not the arbitrator.'"
793 So.2d at 748 (quoting Green Tree Fin. Corp. v. Wampler, 749 So.2d 409, 413, 415 (Ala.1999), and citing Ex parte Napier, 723 So.2d 49 (Ala.1998)); Ex parte Dan Tucker Auto Sales, Inc., 718 So.2d at 41 (Lyons, J., concurring specially).
We agree with Branch and the cases cited in that opinion. Because Mrs. Ashby contends that the arbitration agreement included in the note and security agreement was itself unconscionable, the trial court did not err in holding that it had the authority to resolve that issue.
II. Did the trial court err in ruling that the arbitration agreement included in the note and security agreement was unconscionable as a matter of law?
American General Finance and Anderson argue that the trial court erred in concluding that the arbitration agreement included in the note and security agreement was unconscionable as a matter of law. In reaching that conclusion, the trial court relied heavily upon Branch, which it summarized in its order. In pertinent part, the trial court's order provided:
"The defense of unconscionability must be addressed by the trial court. Green Tree Financial Corp. v. Vintson, 753 So.2d 497 (Ala.1999). The party asserting the affirmative defense of unconscionability has the burden of proof. Green Tree Fin. Corp. v. Wampler, 749 So.2d 409 (Ala.1999). The doctrine of unconscionability is codified at [Ala.Code 1975, § 5-19-16], which provides:
"`With respect to a consumer credit transaction, if the court as a matter of law finds the contract or any provision of the contract to have been unconscionable at the time it was made, the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable provision, or it may so limit the application of any unconscionable provision so as to avoid any unconscionable result.'
"The Alabama Supreme Court set forth a two-part test to be applied by this court in determining unconscionability: (1) Terms that are grossly favorable to a party that has (2) overwhelming bargaining power. American General Finance, Inc. v. Branch, 793 So.2d 738, 748 (Ala.2000). The court notes that the arbitration clause in the note and security agreement supplied by [American General Finance] in this case is identical to that supplied by [American General Finance] in Branch. The Alabama Supreme Court affirmed the trial court's denial of [American General Finance's] Motion to Compel Arbitration in Branch because it found the arbitration clause unconscionable.
"The same grossly favorable terms favoring [American General Finance] that *175 existed in Branch are present here. The first indicium of unconscionability is the breadth of the clause. The Branch court stated that the clause applied `to every cause of action that could conceivably arise in favor of Branch, and to every individual against whom a claim could conceivably be brought.' Id.
"A second indicium of unconscionability is the provision purporting to invest the arbitrator with the threshold issues of arbitrability. The Branch court stated that `"[s]uch authority of the arbitrator to determine its own authority may itself be an indicium of unconscionability." `Id. at 749, quoting Brilliant Homes, Ltd. v. Lind, 722 So.2d 753, 755 (Ala.1998).
"A third indicium of unconscionability is the provision exempting the defendants from the duty to arbitrate and expressly reserving the right to try to a jury their claims against the Ashbys up to $10,000. In Branch, the Alabama Supreme Court stated:
"`Practically speaking, this provision benefits only the [l]enders. In other words, American General [Finance] reserved for itself the right to collect by judicial action the loan paymentsthe only species of claim it would ever realistically be expected to assert against Branchwhile requiring Branch to settle by arbitration claims such as breach of contract and fraudthe species of claims she would most likely assert against the [l]enders.' (emphasis in original).
[793 So.2d at 749.]
"The [American General Finance] arbitration provision limits the right of the arbitrator to award an amount in excess of five times the amount of economic loss. The Branch court stated `this limitation includes not only punitive damages, but all species of noneconomic loss, such as mental anguish.' [793 So.2d at 749.] The Branch court found it significant that the arbitration clause prevented the borrower from obtaining the full range of relief available under Alabama law, but allowed the lenders to seek full redress for their claims in court. Id.

"The Branch court found that the [American General Finance] arbitration provisions were so grossly favorable to the defendants as to pass the first prong of the unconscionability test. Id. at 750. Along with each grossly favorable term constituting an indicium of unconscionability found in the Branch case, this court finds an additional indicium of unconscionability. The Ashbys requested that the defendants explain the terms of the contract to them. The defendant's agent chose not to explain, or even mention, the arbitration clause. Such a refusal of assistance is an indicium of unconscionability. Ex parte Napier, 723 So.2d 49, 52 (Ala.1998).
"The second prong of the unconscionability test set forth in Branch is overwhelming bargaining power. American General Finance, Inc. v. Branch, 793 So.2d 738, 748 (Ala.2000). The Branch court stated that `[a] primary indicium of unconscionability in the modern consumer-transaction context is whether the consumer has the ability "to obtain the product made the basis of [the] action" without signing an arbitration clause.' Id. at 750, quoting Green Tree Fin. Corp. v. Wampler, 749 So.2d 409, 415 (Ala.1999).
"In Branch, the record contained stipulations and affidavit testimony of eight of the sixteen companies (the eight including [American General Finance]) that were listed in the advertising pages of the Southern Directory Company telephone directory for the City of Tuscaloosa under the heading of `financing.' *176 Of those eight companies only one did not routinely enter into arbitration agreements in connection with its loans during the applicable time period. [793 So.2d] at 751. The Branch court noted that `"[e]ntire segments of the market for certain goods and services ... are being closed to consumers who are unwilling to forfeit their rights guaranteed them by the federal and state Constitutions." `Id., quoting Allstar Homes, Inc. v. Waters, 711 So.2d 924, 933 (Ala. 1997). The Branch court held that [American General Finance] possessed overwhelming bargaining power because `Branch would have had to expend considerable time and effort even to find [companies that would not require arbitration].' [793 So.2d] at 751 (emphasis in original).
"In the case at hand, the record reveals that ten companies advertised under the heading `financing' in the Athens BellSouth Yellow Pages at the time that the Ashbys applied for their loan. The parties presented evidence from nine of those ten companies. Of those nine companies, three (Badcock Home Furnishing Center, First South Production Credit Association and First Trust Mortgage of Athens) did not routinely make loans to consumers using personal property as collateralthe type of loan at issue. All of the six remaining companies, including [American General Finance], required arbitration agreements of their customers. The record further reveals that the defendants presented affidavits from four banks and financial institutions that did not require arbitration agreements that maintained an office in Athens, Alabama, but [that] were not listed under `financing' in the Yellow Pages. The evidence also reveals that the Ashbys presented evidence of four such additional institutions that did require arbitration agreements. The defendants presented affidavits from companies that did not require arbitration agreements in cities other than Athens.
"In order to meet their burden of proof on this issue, the Ashbys `need not show that the market was completely closed, only that [they were] unable to acquire goods or services without considerable expenditure of time and resources.' [793 So.2d] at 751 (emphasis in original). The court concludes that the Ashbys have met this burden. The evidence reveals that the Ashbys had no input into the drafting of the note and security agreement provided by [American General Finance]. The court concludes that the evidence demonstrates that the Ashbys had no meaningful choice and that [American General Finance] had overwhelming bargaining power. As a result of the two-part analysis as set forth in Branch, this court holds that the arbitration provisions in the American General Finance contract [are] unconscionable and unenforceable."

The First Prong of BranchGrossly Favorable Terms

As the trial court noted, the arbitration agreement included in the note and security agreement is identical to the arbitration agreement this Court found unconscionable in Branch. Thus, each of the provisions of the Branch arbitration agreement found to be grossly favorable to the lenders is also present in the Ashbys' arbitration agreement with American General Finance. Those provisions grossly favorable to American General Finance are: (1) the breadth of the arbitration agreement, which extends to every cause of action that might conceivably arise in favor of the Ashbys and that applies to every individual or entity against whom the Ashbys might bring a claim; (2) the provision purporting to invest the arbitrator with the threshold *177 issue of arbitrability; (3) the provision reserving to American General Finance the right to a trial by jury while mandating that the Ashbys arbitrate any and every claim that might arise; and (4) the provision limiting the Ashbys' right of recovery for all species of damages to no more than five times the economic loss while preserving American General Finance's right to seek full redress for its claims.
We agree with the trial court that the arbitration agreement contained in the note and security agreement is grossly favorable to American General Finance. Accordingly, Mrs. Ashby has met the first prong of the Branch unconscionability test.

The Second Prong of Branch Overwhelming Bargaining Power

American General Finance and Anderson argue that the trial court erred in finding the arbitration agreement unconscionable because, they argue, Mrs. Ashby failed to meet the second prong of the Branch unconscionability test. American General Finance and Anderson argue that the trial court ignored evidence presented indicating that there were lenders in the financial market available to the Ashbys that would make loans without requiring an arbitration agreement and that ignoring that evidence caused the trial court to err in concluding that the Ashbys had no meaningful choice and could not obtain an arbitration-free loan. Further, American General Finance and Anderson argue that Mrs. Ashby cannot meet the second prong of the Branch test because, they say, she failed to present any evidence indicating that she and Mr. Ashby actually shopped around for an arbitration-free loan. We reject these arguments.
First, we note that the trial court limited the financial market it considered to be available to the Ashbys to those lenders advertising in the yellow pages of the Athens BellSouth telephone directory under "financing" at the time the Ashbys applied with American General Finance for their loan in April 1999.[5] This is exactly the type of comparison this Court made in Branch, and we find no error in this method of determining the applicable market available to the Ashbys. See Branch, 793 So.2d at 751 (considering the appropriate comparable financial market to be composed of those entities listed in the advertising pages of the Southern Directory Company telephone directory for the city nearest the plaintiff).
Moreover, the trial court did not err in concluding that the arbitration agreement in the note and security agreement was unconscionable in the absence of evidence indicating that the Ashbys sought other alternatives to the American General Finance loan. Our decision in Branch regarding meaningful choice was based upon affidavits and stipulations regarding the practices of nearby lenders that were in the business of making loans comparable to the one Branch sought to obtain. In Branch, we stated:
"From the sample responses of the companies providing the kind of financing for which Branch was shopping in her geographical area, it follows that only 1 or 2 companies out of 16 might have allowed her to borrow money in November 1997 without agreeing to arbitrate. Branch would have had to expend considerable time and effort even to find these companies."
793 So.2d at 751 (first emphasis added; second emphasis in original). Thus, our *178 holding in Branch was not based upon evidence showing that Branch had actually gone out and traveled a particular geographical area of the state in an unsuccessful attempt to obtain a loan free from the restriction of an arbitration clause. We concluded that American General Finance possessed overwhelming bargaining power because "Branch would have had to expend considerable effort even to find "the 1 or 2 of the 16 companies that would not have required arbitration. 793 So.2d at 751.
In this case, Mrs. Ashby presented the same type of evidence we considered in Branch. Mrs. Ashby presented the trial court with evidence indicating that, at the time she and Mr. Ashby obtained their loan with American General Finance in 1999, 10 companies, including American General Finance, advertised in the yellow pages of the Athens BellSouth telephone directory under the category "financing." Mrs. Ashby presented evidence indicating that 2 of those 10 companies did not make loans of the type sought by the Ashbys,[6] while 6 companies, including American General Finance, did make loans comparable to the one sought by the Ashbys.[7] Mrs. Ashby presented evidence indicating that all six of those companies required their customers to sign arbitration agreements. Thus, we conclude, as we did in Branch, that the Ashbys would have had to expend considerable time and effort to locate the remaining two companies, and it is unknown whether those companies would have insisted that the Ashbys sign an arbitration agreement.
Justice Stuart, in her special writing, states that she would require evidence showing that the plaintiff actually shopped around for an arbitration-free loan. She relies upon the recent cases of Mason v. Acceptance Loan Co., 850 So.2d 289 (Ala. 2002); Vann v. First Community Credit Corp., 834 So.2d 751 (Ala.2002); and Green Tree Fin. Corp. v. Lewis, 813 So.2d 820 (Ala.2001). Her writing prompts additional observations.
Anderson, the corporate defendants' agent and himself a defendant, admits that he knew that the Ashbys could not read the documents he presented to them. The "operating procedures" of American General Finance itself therefore required Anderson to explain those documents to the Ashbys, and Anderson did in fact undertake and purport to explain the documents to the Ashbys. These facts are undisputed. Mrs. Ashby, further, has submitted evidence indicating that she and Mr. Ashby requested an explanation of the documents and that Anderson withheld from the explanation he gave any mention of the presence or the effect of any "arbitration agreement."
Mason, on which Justice Stuart relies in her special writing, cites Mitchell Nissan, Inc. v. Foster, 775 So.2d 138, 140 (Ala. 2000), for the proposition that "an illiterate person, `if he neglects to have [a document he signs] read, or to [i]nquire as to its contents,' cannot, `in the absence of fraud, deceit, or misrepresentation, avoid the effect of his signature because [he is] not informed of its contents.'" (Quoting Beck *179 & Pauli Lithographing Co. v. Houppert & Worcester, 104 Ala. 503, 506, 16 So. 522, 522 (1894).) Mrs. Ashby's evidence fulfills both exceptions to the binding effect of their signatures. First, they did "[i]nquire as to ... [the] contents" of the documents. Id. Second, Anderson did commit "fraud, deceit, or misrepresentation," Foster, 775 So.2d at 140, if Mrs. Ashby's allegation that in explaining the documents he failed to mention the arbitration agreement be true.
Neither Vann nor Lewis constitutes a retreat from Branch. Each turns on the utter failure of the plaintiffs to submit evidence of the scarcity of lenders that did not require arbitration agreements in the particular market in which the plaintiffs were seeking loans. Vann, 834 So.2d at 754, and Lewis, 813 So.2d at 825. Mrs. Ashby, like the plaintiff in Branch, did submit such evidence.
Finally, the facts of this case do not logically present an issue whether the Ashbys should have "actually shopped around" for a lender that would not require that they execute an arbitration agreement. The Ashbys' inability to read the documents and agent Anderson's alleged failure to mention the "arbitration agreement" when he undertook and purported to explain the documents to them deprived the Ashbys of any reason to "shop around" for such a lender.
The trial court also determined, and we agree, that the Ashbys had no input into negotiating the terms of or drafting the arbitration agreement. This evidence establishes that the Ashbys had no meaningful choice in accepting the arbitration agreement and that American General Finance had overwhelming bargaining power in obtaining the arbitration agreement.[8] For these reasons, we find that the evidence is sufficient to meet the second prong of the Branch unconscionability test.

Severability Provision
American General Finance and Anderson next argue that, even assuming that the trial court properly concluded that the arbitration agreement included in the note and security agreement contains some unconscionable provisions, the trial court erred by not striking only those provisions it found to be unconscionable while enforcing the remainder of the arbitration agreement, pursuant to the severability clause included in that arbitration agreement. American General Finance and Anderson rely upon Cavalier Mfg., Inc. v. Jackson, 823 So.2d 1237 (Ala.2001), overruled on other grounds, Ex parte Thicklin, 824 So.2d 723 (Ala.2002); and on Ex parte Thicklin, supra, as authority for their argument.
In Cavalier Manufacturing and Ex parte Thicklin this Court struck only the offensive provisions of the arbitration agreements under consideration in those cases and upheld the remainder of those agreements. However, the arbitration agreements considered in those cases contained only one unconscionable provision; the arbitration agreement in this case is *180 unconscionable in numerous aspects. For this reason alone, Cavalier Manufacturing and Ex parte Thicklin are distinguishable.
Additionally, in Ex parte Thicklin, this Court expressly recognized:
"This Court has limited authority to deal with the enforceability of contract terms. It can nullify or reform a contract on the basis of fraud; it can also nullify or reform a contract to eliminate any unconscionable provisions or terms that violate public policy."
824 So.2d at 732 (citing in a footnote Ex parte State Farm Fire & Cas. Co., 764 So.2d 543, 546 (Ala.2000) (Lyons, J., concurring specially)). See also § 5-19-16, Ala.Code 1975, which states, in pertinent part:
"With respect to a consumer credit transaction, if the court as a matter of law finds the contract or any provision of the contract to have been unconscionable at the time it was made, the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable provision, or it may so limit the application of any unconscionable provision so as to avoid any unconscionable result."
We conclude that the arbitration agreement included in American General Finance's note and security agreement meets the two-part test for unconscionability set forth in Branch. The entire arbitration agreement is unconscionable and therefore unenforceable. We affirm the trial court's order denying the motion to compel the Ashbys' claims against American General Finance and Anderson to arbitrate under that agreement.
III. Did the trial court err in concluding that Mr. Ashby's fraud claim presented a question for the jury?
Mrs. Ashby alleges that the arbitration agreement executed in connection with the Merit Life application for credit-life insurance was obtained by fraud.[9] The trial court concluded that Mrs. Ashby presented substantial evidence of fraud in the factum and, therefore, that her claims must be resolved by a jury. Merit Life appeals. We affirm.
Whether we view Mrs. Ashby's fraud claim as one of fraudulent inducement or as one of fraud in the factum, we conclude that the claim presents a jury question.
If we construe the claim as alleging that Mr. Ashby was fraudulently induced into signing the arbitration agreement presented in conjunction with Merit Life's credit-life insurance application, that claim is not subject to arbitration because it is directed at the arbitration agreement itself.[10] In Investment Management & Research, Inc. v. Hamilton, 727 So.2d 71 (Ala.1999), this Court stated:
"[W]hen a claim of fraud in the inducement is directed toward the arbitration clause itself, the issue is adjudicated by the court. On the other hand, when a claim of fraud in the inducement is directed toward the entire contract ... the issue is subject to arbitration." *181 727 So.2d at 78 (relying on Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967)).
Conversely, if we construe the claim as alleging that Mr. Ashby was deceived as to the character or basic nature of the document (i.e., the arbitration agreement) he signed, the claim is one of fraud in the factum. Claims of fraud in the factum are likewise not subject to arbitration. As this Court recognized in Harold Allen's Mobile Home Factory Outlet, Inc. v. Early, 776 So.2d 777 (Ala.2000):
"We do not interpret the Earlys' allegations as falling within the class of fraud termed fraud in the factum, or execution, as distinguished from fraud in the inducement, or treaty, and, thus, as permitting the Earlys to avoid the obligation to arbitrate. See Drinkard v. Embalmers Supply Co., 244 Ala. 619, 14 So.2d 585 (1943) (explaining distinction between fraud in the factum and fraud in the inducement). As Professor Farnsworth explains in his treatise, fraud in the factum applies only `[i]n rare cases [where] the misrepresentation is regarded as going to the very character of the proposed contract itself....' E. Allen Farnsworth, Contracts, § 4.10 (1982); see also Restatement (Second) of Contracts § 163 & cmt. a (1981) (`If a misrepresentation as to the character or essential terms of a proposed contract induces conduct that appears to be a manifestation of assent by one who neither knows nor has reasonable opportunity to know of the character or essential terms of the proposed contract, his conduct is not effective as a manifestation of assent.'). These rare cases `"include situations involving blind persons, illiterate persons, [and] foreign speaking persons."' Alfa Mutual Ins. Co. v. Northington, 561 So.2d 1041, 1049 (on application for rehearing) (Houston, J., concurring specially) (citations omitted); see, e.g., Cancanon v. Smith Barney, Harris, Upham & Co., 805 F.2d 998 (11th Cir.1986) (case involving persons who `[had] no knowledge of the English language' 805 F.2d at 999). Alabama law has a long line of cases recognizing the following rule regarding fraud in the factum:
"`"`When the execution of an instrument, which the party signing did not intend to sign, and did not know he was signing, is procured by a misrepresentation of its contents, and the party signing it does so without reading it or having it read, relying upon such misrepresentations and fraud, and believing he is signing a different instrument, he can avoid the effect of his signature notwithstanding he was able to read and had an opportunity to read the instrument.'"'

"Willcutt v. Union Oil Co. of California, 432 So.2d 1217, 1220 (Ala.1983) (quoting earlier cases and collecting cases). See also W.T. Rawleigh Medical Co. v. Wilson, 7 Ala.App. 242, 252, 60 So. 1001, 1005 (1912), and cases cited therein. Alabama caselaw, like the Restatement, recognizes that to constitute fraud in the factum, and thereby to prevent the formation of a contract, the misrepresentation must go to the essential nature or existence of the contract itself, for example, a misrepresentation that an instrument is a promissory note when in fact it is a mortgage, see Edwards v. Tabb, 242 Ala. 209, 210, 5 So.2d 770, 771 (1942). A misrepresentation that concerns a misapprehension of the legal meaning of a term or provision in a contract does not constitute fraud in the factum. See Rutter & Hendrix v. Hanover Fire Ins. Co., 138 Ala. 202, 215, 35 So. 33, 37 (1903) (`"[A]ll our decisions hold, that in the absence of a relation of *182 trust and confidence, or of some other peculiar fact or circumstance, a misrepresentation of [a] matter of law, or of [a] matter of judgment equally open to the observation or inquiries of both parties, or of mere opinion, will not vitiate a contract." ... "[A] misrepresentation of the legal effect of a written instrument was, from its very nature, but the expression of an opinion upon a question of law, equally open to the observation and inquiries of both parties, and as to which, the law presumes that the party to whom it was made had knowledge."') (citations omitted); see also Restatement (Second) of Contract § 164 & cmt. b, illus. 2 & 3 (1981).
"The Earlys do not allege that they did not know they were signing an arbitration agreement (indeed, their question to Harold Allen's salesman makes it clear they were aware of the arbitration agreement) or that the salesman represented that the document they were signing was not an arbitration agreement or that it had no legal effect. Instead, they allege that Harold Allen's salesman misrepresented the legal meaning of the arbitration agreement and that they relied on that misrepresentation. However, under the rule of Rutter & Hendrix, absent a confidential relationship or other special circumstances between the Earlys and Harold Allen, the salesman's misrepresentation of the legal meaning of the arbitration agreement cannot form the basis for a claim of fraud in the factum. Accordingly, we would interpret the Earlys' allegations as going to inducement."
776 So.2d at 783 n. 6.
Although Mrs. Ashby's allegations could fit under either type of case, her allegations appear to be virtually identical to those presented in Oakwood Mobile Homes, Inc. v. Barger, 773 So.2d 454 (Ala. 2000), which this Court characterized as involving fraud in the factum. In that case, this Court stated:
"Fraud in the inducement consists of one party's misrepresenting a material fact concerning the subject matter of the underlying transaction and the other party's relying on the misrepresentation to his, her, or its detriment in executing a document or taking a course of action. See Reynolds v. Mitchell, 529 So.2d 227 (Ala.1988).
"Larry Barger's assertionthat he signed the arbitration agreement in reliance upon Clary's [Oakwood's manager's] statement that Larry was signing papers for insurance purposes so that the mobile home could be movedis better characterized as a claim of fraud in the factum. Fraud in the factum occurs when a party `procures a[nother] party's signature to an instrument without knowledge of its true nature or contents.' Langley v. Federal Deposit Ins. Corp., 484 U.S. 86, 93, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987). See also Drinkard v. Embalmers Supply Co., 244 Ala. 619, 14 So.2d 585 (1943), and Burroughs v. Pacific Guano Co., 81 Ala. 255, 1 So. 212 (1887). Fraud in the factum constitutes ineffective assent to the contract. Cancanon v. Smith Barney, Harris, Upham & Co., 805 F.2d 998 (11th Cir.1986).
". . . .
"In Shearson Lehman Bros. [, Inc. v. Crisp, 646 So.2d 613 (Ala.1994)], this Court recognized that a challenge to avoid or to rescind a contract is subject to arbitration but a challenge to the very existence of a contract is not subject to arbitration. A claim of fraud in the factum is a challenge to the very existence of the contract.... [B]ecause this Court has adopted the rationale of Three Valleys [Municipal Water District v. E.F. Hutton & Co., 925 F.2d 1136 (9th *183 Cir.1991)], a claim of fraud in the factum is to be decided by a trial court or a jury.
"The Bargers claim that Clary represented the documents as being `for insurance purposes,' when, in fact, one of the documents was an arbitration agreement, which Larry never knowingly signed as an arbitration agreement. Therefore, we treat the Bargers' claim of fraud in the inducement as a claim of fraud in the factum. The critical issue is whether the Bargers presented substantial evidence to support a claim of fraud in the factum.
"Fraud in the factum is a traditional fraud. A claim of fraud, including such fraud as fraud in the factum, requires the party making the claim to prove by substantial evidence that he or she reasonably relied on the alleged misrepresentation."
773 So.2d at 459-61. In addressing the merits of Barger's fraud claim, the Barger Court pointed out that the arbitration agreement signed by Larry was clearly marked "ARBITRATION AGREEMENT"; that Larry did not state in his affidavit that he could not read; and that Larry did not state that Clary had prevented him from reading the documents he signed. 773 So.2d at 461. Because of those factors, the Barger Court concluded that Larry would have had to close his eyes to the truth to believe that the documents he signed did not include an arbitration agreement and that, therefore, Larry could not establish the necessary element of reasonable reliance to support his fraud claim. For that reason, the Barger Court held that Barger's fraud claim lacked merit and that the trial court had erred in denying Oakwood's motion to compel Barger's claims to arbitration.
Implicit in the Court's holding in Barger was the recognition that Oakwood's agentClaryhad no duty to expressly disclose the existence of the arbitration agreement to Barger because Barger was capable of reading the documents himself. This is consistent with Alabama contract law. See, e.g., Rutter & Hendrix v. Hanover Fire Ins. Co., 138 Ala. 202, 215, 35 So. 33, 37 (1903), quoted in Harold Allen's Mobile Home Factory Outlet, 776 So.2d at 783 n. 6.
This case shares some similarities with Barger. Mrs. Ashby, as Mr. Ashby's personal representative, acknowledges that Mr. Ashby intended to sign the credit-life insurance application and that Anderson told him he was signing an application for credit-life insurance. As did the plaintiff in Barger, Mrs. Ashby alleges that Mr. Ashby was not told that one of the documents he was signing was an arbitration agreement; Mrs. Ashby alleges that Mr. Ashby had no knowledge that he was entering into such an agreement. Here the similarities to Barger end.
Unlike the plaintiff in Barger, Mr. Ashby could not read. Anderson knew that Mr. Ashby could not read, and, under the facts of this case, Mr. Ashby had no way to determine for himself that he was signing, in addition to an application for credit-life insurance, an agreement to arbitrate any claim he might have against Merit Life. We cannot say, as we could and did in Barger, that Mr. Ashby must have closed his eyes to the truth to believe the document he signed was not an arbitration agreement. We conclude that whether Mr. Ashby's reliance upon Anderson's representations was reasonable must be determined by the finder of fact.
Moreover, we are presented with allegations that, if meritorious, give rise to the special circumstances absent in Barger: the Ashbys were unable to read the documents for themselves; Anderson was aware of the fact that the Ashbys could *184 not read the documents; Mrs. Ashby alleges that she and Mr. Ashby asked Anderson to explain the documents to them but, she alleges, he failed to do so; and American General Finance's own internal operating procedures required Anderson to explain the documents to any customers who indicated that they were unable to read. The parties dispute whether such an explanation was given. Further, Anderson wrote at the bottom of the arbitration agreement: "THIS DOCUMENT EXPLAINED AND UNDERSTOOD BY APPLICANT." However, Mrs. Ashby alleges that this statement is false because, she says, the arbitration agreement was never explained or mentioned to them. Again, a factual dispute exists.
These circumstances present a question of fact as to whether, under the circumstances of this case, Anderson had a duty to disclose the existence of the arbitration agreement to Mr. Ashby and, if so, whether he did in fact make such a disclosure. Because these issues address the validity of the Ashbys' agreement to arbitrate, they are to be resolved by the fact-finder.

Conclusion
We conclude that the arbitration agreement included in American General Finance's note and security agreement is unconscionable and therefore unenforceable. We also conclude that the question whether the arbitration agreement contained in the Merit Life application for credit-life insurance was obtained by fraud is a question for the jury. We affirm the trial court's denial of the motions to compel arbitration filed by American General Finance, Anderson, and Merit Life.
AFFIRMED.
HOUSTON, LYONS, JOHNSTONE, HARWOOD, and WOODALL, JJ., concur.
MOORE, C.J., concurs in the result.
BROWN and STUART, JJ., concur in part and dissent in part.
SEE, J., concurs in the result in part and dissents in part.

Appendix to Per Curiam Opinion
The following evidence regarding financial companies, banks, and credit unions doing business in the Athens, Decatur, and Huntsville areas at the time the Ashbys applied for their loan was before the trial court. The first 10 of the following lenders advertised in the yellow pages of the BellSouth telephone directory under the category "financing" for the cities of Athens and Elkmont at the time the Ashbys obtained their loan from American General Finance:
1. American General FinanceAthens; made similar consumer loans; required arbitration agreement;
2. Colonial BankAthens location; made similar consumer loans; routinely required arbitration agreement;
3. First Family Financial ServicesAthens; made similar consumer loans; required arbitration agreement;
4. 1st Community Credit Corporation Athens; made similar consumer loans; required arbitration agreement;
5. Washington Mutual Finance Company (formerly Blazer Financial Services); made similar consumer loans; required arbitration agreement;
6. Wells Fargo Financial Alabama, Inc., f/k/a Norwest FinancialAthens; made similar consumer loans; required arbitration agreement;
7. Compass BankAthens;
8. Badcock Home Furnishing Center Athens; did not make similar loans secured by personal property;
*185 9. First South Agricultural Credit Association (formerly First South Production Credit)Athens; did not make similar loans secured by personal property;
10. First Trust Mortgage of Athens;
11. First State LoansAthens; made similar consumer loans; required arbitration agreement;
12. Alabama MoneyAthens; made similar consumer loans; required arbitration agreement;
13. First Southern United Financial Servicesmaintained an office in Athens until June 1999; made similar consumer loans; did not routinely require arbitration agreement;
14. First Commercial Bank of Huntsville; made similar consumer loans; did not routinely require arbitration agreement;
15. South BankHuntsville; made similar consumer loans; did not routinely require arbitration agreement;
16. North Alabama BankHuntsville and Hazel Green locations; made similar consumer loans; did not routinely require arbitration agreement;
17. Heritage BankHuntsville and Decatur locations; made similar consumer loans; did not routinely require arbitration agreement;
18. Family Security Credit UnionDecatur, Hartselle, and Athens Locations; made similar consumer loans; did not routinely require arbitration agreement; Mrs. Ashby was not and is not a member of the credit union and would have had to join credit union to apply for a loan;
19. Regions BankAthens; made similar consumer loans; routinely required arbitration agreement;
20. First American BankAthens; made similar consumer loans; did not routinely require arbitration agreement;
21. Reliance BankAthens; made similar consumer loans; did not routinely require arbitration agreement;
22. Union Planters BankHartselle and Athens branches; made similar consumer loans; routinely required arbitration agreement.
The record reveals that Compass Bank (no. 7) and First Trust Mortgage of Athens (no. 10) were listed under the category "financing" in the 1999 Athens BellSouth telephone directory. Although the record does not contain evidence regarding the lending practices of either of those lenders, they are included on the above list for the purpose of making the list complete.
BROWN, Justice, concurring in part and dissenting in part.
I disagree with the portion of the majority opinion that holds that the arbitration agreement included in the note and security agreement between American General Finance and the Ashbys is unconscionable and therefore unenforceable.
First, I do not believe that the terms of the arbitration agreement, when considered either singly or as a whole, are unconscionable. Although this Court has held that "agreements to arbitrate are not in themselves unconscionable," Ex parte McNaughton, 728 So.2d 592, 598 (Ala. 1998), I believe that the majority opinion impermissibly "single[s] out the provisions of [the] arbitration agreement[ ] for suspect status" and places the arbitration agreement on a different footing from other contracts. Harris v. Green Tree Fin. Corp., 183 F.3d 173, 183 (3d Cir.1999). See also Doctor's Assocs., Inc. v. Casarotto, 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996) (noting that in enacting *186 the Federal Arbitration Act, "Congress precluded States from singling out arbitration provisions for suspect status, requiring instead that such provisions be placed `upon the same footing as other contracts.' " (quoting Scherk v. Alberto-Culver Co., 417 U.S. 506, 511, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974)); Green Tree Fin. Corp. of Alabama v. Wampler, 749 So.2d 409, 416-17 (Ala.1999) ("we are not at liberty to treat arbitration agreements as inherently unfair or oppressive" (citing McNaughton and Coleman v. Prudential Bache Sec., Inc., 802 F.2d 1350, 1352 (11th Cir.1986), following Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983))).
Moreover, I dissented in American General Finance, Inc. v. Branch, 793 So.2d 738 (Ala.2000), because in that case, as here, there was not a shred of evidence indicating that, before the plaintiff signed the arbitration agreement, she attempted to locate a lender that did not require the execution of an arbitration agreement in conjunction with a loan, and there was no evidence indicating that the plaintiff had attempted to negotiate with the defendant a contract that did not include an arbitration agreement. See Branch, 793 So.2d at 752 n. 6 (Hooper, C.J., concurring in the result in case 1990888, but dissenting in case 1990887).
STUART, Justice, concurring in part and dissenting in part.
I concur with the per curiam opinion except for two aspects: I dissent from the holding that Mrs. Ashby, without presenting evidence that she and Mr. Ashby actually shopped around in an attempt to secure an arbitration-free loan, has established that they had no meaningful choice but to accept the arbitration provision offered by American General Finance. I also dissent from the holding that this Court need not apply the severability provision found in the arbitration agreement.
I conclude that the "hindsight" evidence offered by Mrs. Ashby is insufficient to establish that the Ashbys lacked a meaningful choice in whether to accept the arbitration provision contained in American General Finance's note and security agreement. Mrs. Ashby testified that she and Mr. Ashby wanted to do business with American General Finance for two reasons: American General Finance made the process easy for them and American General Finance would provide Mr. Ashby with credit-life insurance. The record does not indicate that the Ashbys consulted with any other lender before deciding to do business with American General Finance.
It appears that this Court did not require the plaintiff in Branch to offer evidence showing that, before she obtained the loan in question she had actually shopped for but was unable to find or obtain an arbitration-free loan in order to establish that she had no meaningful choice in obtaining such a loan. However, since Branch, we have released at least two opinions that stand for the proposition that a plaintiff must offer such evidence. See Vann v. First Community Credit Corp., 834 So.2d 751 (Ala.2002) (plaintiffs who challenged an arbitration provision as unconscionable failed to present evidence indicating that they were unable to find an alternate lender or that the automobile dealer required them to use a lender who required an arbitration provision); and Green Tree Fin. Corp. v. Lewis, 813 So.2d 820 (Ala.2001) (buyer of a manufactured home challenged as unconscionable the arbitration provision contained in his purchase contract; this Court held that the provision was not unconscionable because, among other things, the buyer did not *187 show that he had attempted to shop around for financing that did not require arbitration).
These cases properly apply the "no meaningful choice" language from Branch. If these cases conflict with the evidentiary standard created in Branch, which the per curiam opinion interprets as allowing a plaintiff to present after-the-fact evidence of market conditions, I would overrule Branch to the extent they do so. I find it objectionable to invalidate a contract provision under the guise of a consumer's having "no meaningful choice" as to that provision, if the consumer never attempted to determine what choices were available at the time he or she accepted that contract provision. If a consumer is concerned as to whether a contract contains an arbitration provision, surely the customer would attempt to negotiate an arbitration-free contract or would shop around for such a contract.
The per curiam opinion allows a consumer to challenge the enforceability of an arbitration provision by offering evidence that arbitration-free loans were unavailable.[11] However, the per curiam opinion goes further, allowing a consumer to raise this challenge although the consumer learned that arbitration-free loans were unavailable only after the legal dispute had already arisen. Thus, the per curiam opinion allows a consumer to challenge the enforceability of an arbitration provision, based on a lack of the availability of other options, although this lack of other options did not influence the consumer to accept the arbitration provision in the first place. I find this practice unacceptable.
I would hold that for a consumer to establish that he or she lacked a meaningful choice in whether to accept an arbitration provision in his contract, the consumer must present evidence tending to show that, before entering into the contract at issue, he or she actually shopped for an arbitration-free contract but was unable to locate such a contract. I, therefore, dissent from the holding in the per curiam opinion that, to invalidate the arbitration agreement, the Ashbys, before entering into the loan at issue, need not have actually shopped for an arbitration-free loan.
I also dissent from the holding in the per curiam opinion that we need not attempt to apply the severability language found in the American General Finance arbitration agreement. I agree that the arbitration agreement contains terms that are grossly favorable to American General Finance; the parties, however, agreed that such terms, if found by a court to be unconscionable, would be severed from the remainder of the agreement. Rather than simply hold the entire arbitration agreement unconscionable, I would strike the unconscionable provisions and attempt to enforce the remainder of the parties' agreement to arbitrate, if possible.
I also feel compelled to address Mrs. Ashby's claim that she is unable to read and that Mr. Ashby was unable to read and, therefore, that they were forced to rely upon Anderson to "explain" the documents to them, i.e., to explain that the documents contained arbitration agreements. I find this claim problematic for two reasons.
First, the Ashbys were not so unsophisticated that were unable to shop around for a lender willing to provide the credit-life option they desired. Mrs. Ashby testified that she and Mr. Ashby did not want to do business with Regions Bank because *188 they did not believe that Regions Bank would provide Mr. Ashby with credit-life insurance. Despite their limited reading abilities, the Ashbys were clearly sophisticated enough to determine which terms and which provisions of a loan were important to them and to find a lender willing to offer those terms and provisions.
Second, the Ashbys sought to enter into a legally binding contract. However, under the law of Alabama, a person who signs a contract is deemed to know and understand the contents of that document. We applied this legal principle in Mason v. Acceptance Loan Co., 850 So.2d 289 (Ala. 2002), to plaintiffs who were illiterate and mentally handicapped. In that case, we held that the plaintiffs' illiteracy and mental retardation did not relieve them of their obligation to read or to inquire as to the contents of the contracts they were signing.[12] We should apply the same standard in this case.
Nor do I believe that a request from an illiterate person for a generic "explanation" of a contract should be sufficient to trigger a fiduciary relationship in a typical consumer transaction, which is essentially what the per curiam opinion holds. Without a specific inquiry from the consumer, what constitutes an adequate explanation, and who decides when that explanation has been adequately understood by the contracting person? If a party wishes to enter into a contract but is unable to read the terms of that contract for himself, does he not have some obligation to have the terms of that contract read to him so that he can decide if he understands those terms and if they are acceptable? Otherwise, we allow illiterate persons to enter into legally binding contracts, but then to disclaim any knowledge or understanding of those provisions to which, in hindsight, they no longer wish to be bound.
SEE, Justice, concurring in the result in part and dissenting in part.
I concur in part in the result reached in Part I of the "Analysis" section of the per curiam opinion; I concur in the result in Part III of that section, and I dissent from the holding in Part II that the arbitration clause in the note and security agreement is unconscionable.
Mrs. Ashby seeks to avoid performance under arbitration agreements in a note and security agreement ("loan agreement") she and Mr. Ashby entered into with American General Finance and in the credit-life insurance application Mr. Ashby submitted to Merit Life Insurance Company in connection with the Ashbys' loan from American General Finance. Mrs. Ashby alleges that the arbitration agreement in the loan agreement is unconscionable and that Merit Life fraudulently procured Mr. Ashby's agreement to the stand-alone arbitration agreement signed in conjunction with the insurance application by concealing from him the arbitration agreement that was part of the credit life-insurance application. I agree with the per curiam opinion that insofar as Mrs. Ashby alleges that the Ashbys' agreements to arbitrate their dispute with American General Finance and Merit Life are void due to fraud, it was proper for the trial court to decide the gateway questions of arbitrability; and I agree that, to the extent the determination of that question requires answers to questions of material fact, a jury *189 should decide whether Merit Life fraudulently obtained Mr. Ashby's agreement to arbitrate disputes that might arise between him and Merit Life. See Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83-84, 123 S.Ct. 588, 592, 154 L.Ed.2d 491 (2002)("a gateway dispute about whether the parties are bound by a given arbitration clause raises a `question of arbitrability' for a court to decide"). Whether Mrs. Ashby must arbitrate her dispute with Merit Life depends on whether Merit Life did or did not fraudulently procure Mr. Ashby's assent to the arbitration clause in the credit-life insurance application.

The Fraud in the Factum Claim Against Merit Life
Mrs. Ashby has a fourth-grade education and can read only simple words. Mr. Ashby, who is now deceased, was illiterate. Mrs. Ashby stated that she and Mr. Ashby asked Michael Anderson, the agent for American General Finance and Merit Life, to explain to them the various documents associated with the loan before they agreed to the transaction. The trial court found that Mrs. Ashby had established a fraud in the factum defense because Anderson had described the freestanding arbitration agreement that he presented to Mr. Ashby as a contract of insurance and not as an arbitration agreement.
The issue presented is whether, as a matter of law, an illiterate person who signs an agreement to purchase credit-life insurance in which an arbitration clause is a material term can maintain an action against the insurance company for fraud in the factum (and avoid performance under the arbitration clause) when the agent who explained the material terms of the insurance agreement to the illiterate person described the portion of the insurance agreement containing an arbitration clause simply as insurance papers and not as a binding arbitration agreement.
Fraud in the factum occurs when "`a misrepresentation as to the character or essential terms of a proposed contract induces conduct that appears to be a manifestation of assent by one who neither knows nor has a reasonable opportunity to know of the character or essential terms of the proposed contract....'" Harold Allen's Mobile Home Factory Outlet, Inc. v. Early, 776 So.2d 777, 783 n. 6 (Ala.2000)(quoting Restatement (Second) of Contracts § 163 & cmt. a (1981)).[13] A "determination of whether a term is [an] essential [term] must be done with respect to the contract and the particular circumstances in each case." Conner v. Lavaca Hospital Dist., 267 F.3d 426, 434 (5th Cir. 2001). Generally, "[t]he essential terms of an insurance contract are the rate of premium, *190 the duration of the policy, the nature of the risk, a description of the property or person or interest to be insured and its location, and the amount of the insurance." Gulf Gate Mgmt. Corp. v. St. Paul Surplus Lines Ins. Co., 646 So.2d 654, 658 (Ala.1994). An insurance agent ordinarily would not commit fraud in the factum if the agent explained or read an insurance contract to an illiterate person and omitted a discussion of an arbitration agreement, because such an agreement is not an essential element in an insurance contract.[14]
However, Mrs. Ashby alleges that in this case Anderson characterized the arbitration agreement as "insurance papers." If Anderson engaged in such an active mischaracterization of the arbitration agreement, that conduct is compelling evidence that Merit Life considered the arbitration agreement an essential element in the insurance contract; therefore, Merit Life may be estopped to deny that the arbitration agreement is an essential element and would have been required to disclose the agreement to the Ashbys.
There is other evidence indicating that Merit Life considered the arbitration agreement an essential element.
"In determining whether a term is an essential element of a contract, we look at whether a party's rejection of the term[ ] could have affected the negotiation of other terms ... `[A]n "essential" promise denotes one that the parties reasonably regarded, at the time of contract, as a vitally important part of the bargain....'"
Conner, 267 F.3d at 433 (citations omitted). Merit Life stated in its brief to this Court that Anderson, its agent, presented to Mr. Ashby, along with the insurance application, "a separate agreement containing the bold and capitalized words `arbitration of claims and waiver of jury trial.' " Merit Life required Mr. Ashby not only to sign the insurance application but also to sign the arbitration agreement. By these actionsidentifying the arbitration agreement with bold capitalized letters, presenting the arbitration agreement as a separate document, requiring that Mr. Ashby sign the arbitration agreement as well as the insurance applicationMerit Life indicated that the arbitration clause was an essential element in its insurance contract with the Ashbys. Thus, Merit Life considered the agreement to arbitrate disputes an essential element in the credit-life insurance agreement and created for itself a duty to disclose and to explain the arbitration clause when Mr. Ashby asked Anderson to read and explain the loan and insurance documents.
I concur with the holding of the per curiam opinion that Mrs. Ashby may maintain, as a matter of law, a fraud in the factum claim against Merit Life.

Trial Court's Consideration of Arbitrability and Unconscionability
Mrs. Ashby argues that she is not required to arbitrate her dispute with American General Finance because, she argues, the arbitration clause in the loan agreement is unconscionable. The arbitration clause in the loan agreement states, in part: "[b]orrower(s) and [American General Finance] agree that, except as otherwise *191 set forth in this provision, all claims, disputes, or controversies of every kind and nature between Borrower(s) and Lender shall be resolved by arbitration"; the agreement also states that "[b]orrower(s) and Lender further agree that all issues and disputes as to the arbitrability of claims must also be resolved by the arbitrator." American General Finance argues that not only does the loan agreement require Mrs. Ashby to arbitrate her dispute, but it also requires that any issues concerning the arbitrability of the dispute and the unconscionability of the arbitration clause be resolved by an arbitrator.
The per curiam opinion finds that the issues presented in this case are virtually identical to those presented in American General Finance, Inc. v. Branch, 793 So.2d 738 (Ala.2000). The arbitration clause at issue in Branch required the parties to submit to an arbitrator any dispute as to arbitrability. Branch argued that she could not be compelled to arbitrate her dispute because, she said, the arbitration clause was unconscionable. Chief Justice Hooper dissented in Branch because he believed the presence of the clause requiring that disputes about arbitrability be submitted to an arbitrator required the Court to treat the arbitrability question and the unconscionability question as distinct issues, and he believed the issue of arbitrability was to be submitted to the arbitrator.[15] 793 So.2d at 753-54. I also dissented in Branch. I believed that Branch had not demonstrated that she had no meaningful choice with respect to the arbitration provision. 793 So.2d at 754.
In First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 943, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995), the Supreme Court of the United States held that "the question, `who has the primary power to decide arbitrability' turns upon what the parties agreed about that matter" (emphasis in original). If the parties agreed in the arbitration agreement that the arbitrator shall decide questions of arbitrability what is called a First Options clausethen with the exception of whether the parties actually agreed to a First Options clause, an arbitrator should decide all questions of procedural and substantive arbitrability. See Howsam v. Dean Witter Reynolds, Inc., supra. The Supreme Court has stated:
"[O]ne might call any potentially dispositive gateway question a `question of arbitrability'.... The Court's case law, however, makes clear that, for purposes of applying the interpretive rule [of what constitutes a threshold issue for judicial determination], the phrase `question of arbitrability' has a far more limited scope. The Court has found the phrase applicable in the kind of narrow circumstance where contracting parties would likely have expected a court to have decided the gateway matter, where they are not likely to have thought that they had agreed that an arbitrator would do so, and, consequently, where reference of the gateway dispute to the court avoids the risk of forcing parties to arbitrate a matter that they may well not have agreed to arbitrate."
Howsam, 537 U.S. at 83-84, 123 S.Ct. at 592 (citation omitted). The Supreme Court of the United States also has held that even when an ambiguous contractual provision is susceptible of constructions that may cast doubt on the enforceability of the arbitration agreement itself, such a contractual ambiguity does not raise the type of "`gateway' question of arbitrability *192 ... appropriate for a court to answer ... in the first instance," but instead is the type of question to be decided by an arbitrator. PacifiCare Health Sys., Inc. v. Book, 538 U.S. 401, 407 n. 2, 123 S.Ct. 1531, 1536 n. 2, 155 L.Ed.2d 578 (2003)(holding that the question as to whether a remedial limitation clause in a contract prohibits an award of treble damages under the Racketeer Influenced and Corrupt Organizations Act is not a question of arbitrability for a court to decide, but is itself a question to be decided by the arbitrator).[16]
If parties to a dispute have previously agreed to an arbitration agreement that itself contains a First Options clause and if one of the parties contests in court the arbitrability of the dispute, the only issue properly before the trial court is whether the parties unmistakably agreed to the First Options clause. See Ex parte Perry, 744 So.2d 859, 867 (Ala.1999). Of course, when the trial court considers whether parties have agreed to arbitrate the question of arbitrability, it should "apply ordinary state-law principles that govern the formation of contracts." First Options, 514 U.S. at 944, 115 S.Ct. 1920.
Generally, "[c]ontract defenses that are... applicable under state law, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements...." Ex parte Perry, 744 So.2d at 869 (Lyons, J., dissenting). In the case of a First Options clause, however, the only relevant state-law issue is "whether the parties objectively revealed an intent to submit the arbitrability issue to arbitration." First Options, 514 U.S. at 944, 115 S.Ct. 1920.
Moreover, a court may not find a clause that requires an arbitrator to decide issues of arbitrability unconscionable on its face, because to do so would be invalidating an arbitration provision based on state law "applicable only to arbitration provisions," in violation of the rule set out in Doctor's Associates, Inc. v. Casarotto, 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996). A court holding that a First Options clause is unconscionable would be holding that an arbitration clause is unconscionable merely for requiring the parties *193 to submit an aspect of their dispute to arbitration.[17]
In this case, the trial court properly considered the fraud in the factum issues because those issues go to whether the Ashbys agreed to arbitrate their dispute with American General Finance and Merit Life. Because the arbitration agreement in this case contains a First Options clause, the trial court erred when it considered the question whether the arbitration clause in the loan agreement was unconscionable. Once the trial court considered two threshold issueswhether the arbitration agreement contained a First Options clause and whether the First Options clause was obtained by fraud or duressall other issues of arbitrability should have been decided by an arbitrator.
The per curiam opinion accepts the language from Branch that states, "`"[w]here the attack is addressed to the arbitration clause itself, as opposed to the contract as a whole, the court, and not the arbitrator, resolves the issue."'" 873 So.2d at 174 (quoting Branch, 793 So.2d at 748, quoting in turn Green Tree Fin. Corp. v. Wampler, 749 So.2d 409, 413 (Ala.1999)). The per curiam opinion fails properly to distinguish between Mrs. Ashby's argument that the Ashbys never agreed to arbitrate their dispute because they were not aware of the arbitration agreements (the fraud in the factum claim) and Mrs. Ashby's argument that the arbitration agreement included in the loan agreement is unconscionable. Moreover, Mrs. Ashby does not allege that the First Options clause itself is unconscionable.[18] Therefore I dissent from those portions of Part I and Part II of the "Analysis" section of the per curiam opinion that hold that it was proper for the trial court to consider the unconscionability issue.

The Unconscionability Claim
The per curiam opinion holds that the arbitration agreement in the loan agreement is unconscionable because its terms are grossly favorable to American General Finance and because the Ashbys had no meaningful choice in obtaining an arbitration-free loan. This Court has held that "agreements to arbitrate are not in themselves unconscionable." Ex parte McNaughton, 728 So.2d 592, 598 (Ala. 1998).
"`An unconscionable ... contractual provision is defined as a ... provision "such as no man in his sense and not under delusion would make on the one hand, and as no honest and fair man would accept on the other."'" Southern United Fire Ins. Co. v. Howard, 775 So.2d 156, 163 (Ala.2000) (quoting Layne v. Garner, 612 So.2d 404, 408 (1992)). In Branch, this Court suggested that unconscionability consists of "two essential elements: (1) terms that are grossly favorable to a party that has (2) overwhelming bargaining power." 793 So.2d at 748.[19]
*194 The per curiam opinion states in conclusory terms that the arbitration agreement is overwhelmingly favorable to American General Finance because: (1) the agreement is too broad; (2) the agreement provides that the arbitrator shall consider questions of arbitrability;[20] (3) the agreement lacks mutuality of remedies; and (4) the agreement limits recovery of punitive damages to five times any economic damages. 873 So.2d at 174-75.
None of these issues, considered individually, provide grounds to find the arbitration clause unconscionable. Courts routinely support arbitration in cases involving broad arbitration clauses. See, e.g., Pritzker v. Merrill Lynch, Pierce Fenner & Smith, 7 F.3d 1110, 1114 (3d Cir.1993)(upholding an arbitration agreement that required "all controversies which may arise between us, including but not limited to, any transaction or the construction, *195 performance or breach of this or any other agreement between us, whether entered into prior, on or subsequent to the date hereof, shall be determined by arbitration"); Bess v. Check Express, 294 F.3d 1298, 1308 (11th Cir.2002)(upholding an arbitration clause where "the arbitration agreement here, like that in [American General Finance, Inc. v. ] Branch, [793 So.2d 738 (Ala.2001) ], is unusually broad");[21]Dean Witter Reynolds, Inc. v. McDonald, 758 So.2d 539, 540 (Ala.1999)(upholding an arbitration clause that required arbitration in "all controversies between me or my agents and you or your agents, representatives or employees arising out of or concerning any such accounts, any transactions between us or for such accounts, or the construction, performance, or breach of this or any other agreement between us, whether entered into prior to, on or subsequent to the date below...."). A broad arbitration clause merely indicates that parties have agreed to adjudicate their entire dispute in an arbitral forum.
A clause that requires parties to submit a dispute about the arbitrability of their dispute to the arbitrator cannot be unconscionable.[22] To hold otherwise would impermissibly "single out the provisions of arbitration agreements for suspect status," Harris v. Green Tree Fin. Corp., 183 F.3d 173, 183 (3d Cir.1999), and place such agreements on a different "footing [from] other contracts." 183 F.3d at 183. "Courts may not ... invalidate arbitration agreements under state laws applicable only to arbitration provisions." Doctor's Assocs., Inc. v. Casarotto, 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996). A rule that states it is unconscionable for parties to agree to submit disputes about arbitrability to an arbitrator is a rule that necessarily applies only to arbitration clauses and therefore runs afoul of the holding in Doctor's Associates.
A lack of mutuality of remedy will not render an arbitration clause unconscionable.
"[P]roperly understood, the concept of mutuality of remedy has no application to arbitration agreements....
"The doctrine of mutuality of remedy is limited to the availability of the ultimate redress for a wrong suffered by a plaintiff, not the means by which that ultimate redress is sought. A plaintiff does not seek as his ultimate redress an arbitration proceeding or a court proceeding. Instead, he seeks legal relief (e.g., damages) or equitable relief (e.g., specific performance) for his injury and he uses the proceeding as a means to obtain that result."
McNaughton, 728 So.2d at 598.[23] "In any event, the lack of mutuality of remedy, alone, is not sufficient to support a claim of unconscionability." Vann v. First Community Credit Corp., 834 So.2d 751, 754 (Ala.2002). See also Mason v. Acceptance Loan Co., 850 So.2d 289, 301 *196 (Ala.2002)(stating that a lack of mutuality of remedy "cannot alone be determinative" of unconscionability); Green Tree Fin. Corp. of Alabama v. Wampler, 749 So.2d 409, 417 (Ala.1999)("We simply cannot declare a violation of public policy when one party is required to arbitrate while the other retains a choice."); Willis Flooring, Inc. v. Howard S. Lease Constr. Co. & Assocs., 656 P.2d 1184, 1186 (Alaska 1983)("Arbitration is not so clearly more or less fair than litigation that it is unconscionable to give one party the right of forum selection.").
Finally, limitations on the damages a party may recover do not make an arbitration clause unconscionable. As I stated in my dissent in Cavalier Manufacturing, Inc. v. Jackson, 823 So.2d 1237, 1252 (Ala. 2001)(See, J., dissenting): "The weight of authority supports the conclusion that the parties to an arbitration agreement are free to agree that an arbitrator may not award punitive damages." See also Baravati v. Josephthal, Lyon & Ross, Inc., 28 F.3d 704, 709 (7th Cir.1994)("parties to adjudication have considerable power to vary the normal procedures, ... and surely can stipulate that punitive damages will not be awarded"); Bonar v. Dean Witter Reynolds, Inc., 835 F.2d 1378, 1387 n. 16 (11th Cir.1988)(noting that a "clear provision in a contract prohibiting arbitrators from awarding punitive damages" would be enforceable); Davis v. Prudential Sec., Inc., 59 F.3d 1186, 1192 n. 6 (11th Cir.1995)("Presumably, therefore, even after the Supreme Court's decision in Mastrobuono[ v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995)], parties wishing to avoid the imposition of punitive damages in arbitration may simply expressly exclude punitive damages in the arbitration agreement."). I also note that if the parties litigate their dispute in court, Alabama law limits punitive damages to three times actual damages; thus, the per curiam opinion holds unconscionableor, at least, considers as a factor in finding an agreement unconscionable as against the defendant that the defendant allows a punitive-damages award against him that is greater than that permitted by the Legislature. See § 6-11-21(a), Ala.Code 1975.[24]
The per curiam opinion in this case does not explain why these four elements, each of which considered singly is permissible, operating together somehow make the agreement unconscionable. In Branch, *197 the Court explained that these elements operating together were grossly favorable to the lender because "the Lenders have reserved for themselves the right to full redress for their claims, but denied that right to Branch. In other words, the contract limits not only the right to a specific forum, but the right to a remedy itself." 793 So.2d at 750. The Court's rationale in Branch "assigns a suspect status to arbitration agreements [and] flies in the face of Doctor's Associates, 517 U.S. at 687, 116 S.Ct. 1652, where the Supreme Court of the United States explicitly stated that `[c]ourts may not ... invalidate arbitration agreements under state laws applicable only to arbitration provisions.'" McNaughton, 728 So.2d at 598 (alterations in original). The main opinions in Branch and in this case hold that the arbitration agreement in American General Finance's loan agreement is unconscionable, not because the parties agree to limit the available remedies, but because the limited remedies are to be determined in an arbitral forum in which threshold questions of arbitrability are to be determined by the arbitrator. That result is not permitted by the Federal Arbitration Act. See Doctor's Associates, 517 U.S. at 687, 116 S.Ct. 1652. The fact that a remedy is to be determined in an arbitral forum may not make an arbitration clause unconscionable.
The per curiam opinion also finds that American General Finance possessed overwhelming bargaining power and that the Ashbys lacked a meaningful choice. American General Finance argues that Mrs. Ashby failed to present any evidence indicating that she and Mr. Ashby even attempted to shop for a loan from another company. The per curiam opinion concludes that "the trial court did not err in concluding that the arbitration agreement in the note and security agreement was unconscionable in the absence of evidence indicating that the Ashbys sought other alternatives to the American General Finance loan." 873 So.2d at 177. The per curiam opinion, citing Branch as authority, concludes "that the Ashbys would have had to expend considerable time and effort to locate the remaining two companies...." 873 So.2d at 178. The per curiam opinion held that American General Finance possessed overwhelming bargaining power merely because the Ashbys "`would have had to expend considerable effort even to find' the 1 or 2 of the 16 companies that would not have required arbitration." 873 So.2d at 178 (quoting Branch, 793 So.2d at 751).
I dissented in Branch because Branch had "presented no evidence that she shopped around before borrowing from American General." 793 So.2d at 754 (See, J., dissenting). In both Green Tree Financial Corp. of Alabama v. Vintson, 753 So.2d 497, 504 (Ala.1999), and Green Tree Financial Corp. v. Lewis, 813 So.2d 820, 825 (Ala.2001), cases decided, respectively, before and after this Court decided Branch, this Court held that the borrowers, who failed to present evidence indicating that they had shopped around for a loan, had not demonstrated that they lacked a meaningful choice when presented with an arbitration clause by the lenders. I see no meaningful difference between the evidence presented in Vintson or Lewis and that presented by Mrs. Ashby. Mrs. Ashby has presented no evidence indicating that she and Mr. Ashby actually shopped for a loan agreement that did not contain an arbitration clause (or, for that matter, that they cared); therefore, I would hold that the trial court erred in finding that the Ashbys lacked a meaningful choice.
Even, however, had Mrs. Ashby presented evidence tending to show that the Ashbys had shopped for a loan, she still *198 could have failed to present evidence tending to show that the Ashbys lacked a meaningful choice. The per curiam opinion states: "The trial court also determined, and we agree, that the Ashbys had no input into negotiating the terms of or drafting the arbitration agreement." 873 So.2d at 179.
In Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 170 F.3d 1, 17 (1st Cir.1999), the United States Court of Appeals for the First Circuit held that an employee had failed to demonstrate that an arbitration clause in an employment contract was unconscionable, or that he lacked a meaningful choice, even though "the district court found that signing the U-4 Form [securities dealer-registration form] was a prerequisite for employment as a securities broker...." The fact that every firm in the securities industry required every employee to sign the same arbitration agreement and that employees were not free to alter or remove the arbitration agreement from their employment contracts was not sufficient to demonstrate that the employee lacked a "meaningful choice" when deciding whether to sign the agreement. See Rosenberg 170 F.3d at 17. The First Circuit Court of Appeals stated: "inequality in bargaining power `is not a sufficient reason to hold that arbitration agreements are never enforceable in the employment context'.... Absent a showing of fraud or oppressive conduct ... the contract is not unenforceable on these grounds." 170 F.3d at 17 (footnote omitted). Therefore, Mrs. Ashby would need to demonstrate substantially more than the fact that most lenders, or even every lender, incorporated an arbitration clause into a loan agreement before she could demonstrate that she and Mr. Ashby lacked a meaningful choice when deciding whether to sign the loan agreement.[25] Therefore, I dissent from Part II of the "Analysis" section of the per curiam opinion; I would hold that Mrs. Ashby has failed to prove that the arbitration clause in the Ashbys' loan agreement with American General Finance is unconscionable.
NOTES
[1] The Ashbys lived in Elkmont, Alabama, which is located a few miles outside of Athens, Alabama. Telephone numbers for Athens and Elkmont are published in the same local telephone directory.
[2] Anderson claims that he learned Mr. Ashby could not read only after he had reviewed the federal disclosure statement with the Ashbys, and Mrs. Ashby asked if she could sign for Mr. Ashby. Mr. Ashby testified that they had earlier told Anderson he and Mrs. Ashby could not read and that they had asked him to explain the documents to them. According to the briefs filed with this Court, Mr. Ashby had attended school for only a few weeks and had never been able to read or write. Mrs. Ashby has a fourth-grade education and is able to read small and simple words.
[3] This arbitration agreement does not appear on the application for credit-life insurance; it was printed on a separate, stand-alone document.
[4] Mrs. Ashby's complaint alleges fraud, fraudulent suppression, promissory fraud, conspiracy, breach of contract, negligence, and bad-faith refusal to pay an insurance claim.
[5] See the Appendix to this opinion for a summary of the evidence before the trial court regarding financial companies, banks, and credit unions in the Athens, Decatur, and Huntsville areas at that time.
[6] Another of the 10 companies that advertised was a mortgage companyFirst Trust Mortgage Company. Although the trial court's order indicated that this company did not make loans comparable to the one obtained by the Ashbys, we are unable to locate any evidence in the record regarding the lending practices of this company.
[7] We are unable to locate in the record any evidence regarding the lending practices of Compass Bank, which was another of the 10 lenders advertising under the category "financing" in 1999 in the Athens telephone directory.
[8] American General Finance and Anderson argue that Mrs. Ashby's testimony that she and her husband had obtained a loan within the last 10 years from Regions Bank indicates that the Ashbys could have shopped at local banks for this loan. Because some local banks did not require consumers to sign arbitration agreements in 1999, American General Finance and Anderson argue that the Ashbys had a meaningful choice whether to obtain a loan without an arbitration agreement. However, Mrs. Ashby testified that she and her husband had obtained a loan from Regions Bank at some time in the past but that she had no idea how long ago. She also testified that she and Mr. Ashby did not want to return to Regions Bank for this loan because, given Mr. Ashby's age, Regions Bank would not provide him with credit-life insurance.
[9] Mrs. Ashby alleges that both arbitration agreements were obtained by fraud. Because the trial court concluded that the arbitration agreement included in the note and security agreement was unconscionable and unenforceable, the trial court addressed the issue of fraud only with respect to the arbitration agreement executed in connection with the Merit Life credit-life insurance application.
[10] As discussed below, in the absence of other special circumstances, the allegations do not necessarily state a claim that one was fraudulently induced into executing an arbitration agreement.
[11] I am not certain that Mrs. Ashby proved this. Evidence was presented that arbitration-free loans were available, although arbitration-free loans that also provided credit-life insurance may not have been available to the Ashbys.
[12] The plaintiffs in Mason alleged that they asked what they were signing and that the defendant told them only that the documents were "loan papers and insurance papers," but did not specifically mention the arbitration agreements. Mason, 850 So.2d at 295. This Court concluded that the plaintiffs' claim was one alleging fraudulent inducement directed at the entire contract and thus should be resolved by the arbitrator. Id.
[13] "`"[A] person who signs an instrument without reading it, when he can read, can not, in the absence of fraud, deceit or misrepresentation, avoid the effect of his signature, because [he is] not informed of its contents; and the same rule [applies] to one who can not read, if he neglects to have it read, or to enquire as to its contents."'"

Johnnie's Homes, Inc. v. Holt, 790 So.2d 956, 960 (Ala.2001)(quoting Mitchell Nissan, Inc. v. Foster, 775 So.2d 138, 140 (Ala.2000), quoting in turn Beck & Pauli Lithographing Co. v. Houppert & Worcester, 104 Ala. 503, 506, 16 So. 522, 522 (1894))(emphasis added in Mitchell Nissan).
"`Where [however] there exists this total incapacity to read and understand a writing, then the normal duty to do so is excused and a fraud case is made out by showing that the other party misrepresented the contents of the writing.'"
Alfa Mutual Ins. Co. v. Northington, 561 So.2d 1041, 1049 (opinion on application for a rehearing) (Houston, J., concurring specially)(quoting Morris G. Shanker, Judicial Misuses of the Word Fraud to Defeat the Parol Evidence Rule and the Statute of Frauds (With Some Cheers and Jeers for the Ohio Supreme Court), 23 Akron L.Rev. 1 (1989)).
[14] This Court has previously stated that the inclusion of an arbitration clause does not materially alter an insurance policy, "`[e]ven if the inclusion of the arbitration provision was a material alteration of the policy applied forand we would say it was not....'" American Bankers Ins. Co. of Florida v. Crawford, 757 So.2d 1125, 1130 (Ala.1999)(quoting Ex parte Rager, 712 So.2d 333, 336 (Ala. 1998)). This Court also has found that a merchant has no general duty to "disclose, or explain, an arbitration clause to a buyer." Johnnie's Homes, Inc. v. Holt, 790 So.2d 956, 960 (Ala.2001).
[15] By implication, the arbitrator would then decide whether the agreement was unconscionable.
[16] In PacifiCare, a group of physicians sued PacifiCare and United Healthcare, Inc., alleging, among other things, claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq. PacifiCare moved to compel arbitration under various arbitration agreements contained in its contracts with the physicians. The arbitration agreements prohibited an arbitrator from making an award of punitive damages. The physicians argued that the arbitration agreements were unenforceable under Paladino v. Avnet Computer Technologies, Inc., 134 F.3d 1054, 1062 (11th Cir.1998)(holding that where a remedial limitation in an arbitration agreement prevents a plaintiff from obtaining "meaningful relief" for a statutory claim, the agreement to arbitrate is unenforceable with respect to that claim), because the bar to punitive damages would prevent them from obtaining meaningful relief on their RICO claims. The Supreme Court of the United States agreed that the arbitration agreements might be unenforceable if the punitive-damages bar denied the physicians meaningful relief as to their RICO claims, but the Supreme Court held that a court should not decide whether the dispute was arbitrable based on the mere possibility that an arbitrator might decide that the punitive-damages bar would prevent an award of RICO damages. The Supreme Court found that RICO damages might be punitive or they might be remedial; therefore, the punitive-damages limit in the arbitration agreements may or may not render the agreements unenforceable as to the RICO claims. The Supreme Court concluded that the arbitrator, and not the court, should determine what the damages limitation in the arbitration agreement meant and whether the arbitration agreement was enforceable. PacifiCare Health Sys., 538 U.S. 401, 123 S.Ct. 1531.
[17] Insofar as the Supreme Court of the United States recognized in Howsam that parties may agree to arbitrate "issues of substantive arbitrability," 537 U.S. at 85, 123 S.Ct. at 592, and that such agreements would remove those issues from the province of the trial court, the Supreme Court has indicated that such clauses are not on their face unconscionable.
[18] Mrs. Ashby argues that the inclusion of a First Options clause in an arbitration agreement may, in certain contexts, be an indicium that the entire arbitration clause is unconscionable. (Ashby's brief at 30.) Mrs. Ashby does not argue, however, that a First Options clause is per se unconscionable.
[19] In this case, the applicable doctrine of unconscionability is that codified at § 5-19-16, Ala.Code 1975. Alabama's version of the Uniform Commercial Code, § 7-2-302, Ala. Code 1975, presents the unconscionability doctrine applicable to the sales of goods. The official comment to § 7-2-302, Ala.Code 1975, states, in pertinent part:

"The basic test [of unconscionability] is whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract.... The principle is one of the prevention of oppression and unfair surprise... and not of disturbance of allocation of risks because of superior bargaining power."
See also In re State of New York v. Avco Fin. Serv. of New York, 50 N.Y.2d 383, 389, 429 N.Y.S.2d 181, 406 N.E.2d 1075, 1078 ("The concept, at least as defined in the Uniform Commercial Code ... is not aimed at `disturbance of allocation of risks because of superior bargaining power' but, instead, at `the prevention of oppression and unfair surprise.'").
"`[U]nconscionability as set forth in UCC § 2-302 is `not a concept, but a determination to be made in light of a variety of factors not unifiable into a formula.'" NEC Techs., Inc. v. Nelson, 267 Ga. 390, 392, 478 S.E.2d 769, 771 (1996)(quoting 1 White & Summers, Uniform Commercial Code (4th ed.), § 4-3, p. 213). Unconscionability consists in procedural and substantive elements. NEC Technologies, 267 Ga. at 392, 478 S.E.2d at 771. "As to the substantive element of unconscionability, courts have focused on matters such as the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns." NEC Technologies, 267 Ga. at 392, 478 S.E.2d at 772. "`The procedural element focuses on two factors: "oppression" and "surprise."... "Surprise" involves the extent to which the supposedly agreed-upon terms of the bargain are hidden in a prolix printed form drafted by the party seeking to enforce the disputed terms.'" Mullis v. Speight Seed Farms, Inc., 234 Ga.App. 27, 30, 505 S.E.2d 818, 820-21 (1999)(quoting A & M Produce Co. v. FMC Corp., 135 Cal.App.3d 473, 186 Cal.Rptr. 114, 121-22 (1982)).
"The UCC does not require that there be complete equality of bargaining power or that the agreement be equally beneficial to both parties....
"The cases seem to support the view that there must be additional factors such as deceptive bargaining conduct as well as unequal bargaining power to render the contract between the parties unconscionable. In summary, the doctrine of unconscionability is used by the court to police the excesses of certain parties who abuse their right to contract freely. It is directed against one-sided, oppressive and unfairly surprising contracts, and not against the consequences per se of uneven bargaining power or even a simple old-fashioned bad bargain."
Wille v. Southwestern Bell Tel. Co., 219 Kan. 755, 759-60, 549 P.2d 903, 907 (1976). Moreover, a court will not "relieve a party of his obligations under a contract because he has made a bad bargain containing contractual terms which are unreasonable or impose an onerous hardship on him." Fotomat Corp. of Florida v. Chanda, 464 So.2d 626, 630 (Fla.Dist.Ct.App.1985)(citing Steinhardt v. Rudolph, 422 So.2d 884, 890 (Fla.Dist.Ct.App.1982)).
[20] Branch cited only Justice Lyons's special writing concurring in the result in Brilliant Homes, Ltd. v. Lind, 722 So.2d 753, 755 (Ala. 1998), as authority for the proposition that "the provision purporting to invest the arbitrator with threshold issues of arbitrability" is an indicium of unconscionability. 793 So.2d at 749.
[21] The United States Court of Appeals for the Eleventh Circuit also in Bess distinguished the arbitration clause at issue from that in Branch because it did not contain a limit on punitive damages and did not require the parties to submit questions about arbitrability to the arbitrator. 294 F.3d at 1308.
[22] "[A]greements to arbitrate are not in themselves unconscionable." Ex parte McNaughton, 728 So.2d at 598.
[23] In this case, the arbitration agreement permits American General Finance to seek a judicial remedy to secure only its security interest (or what might be considered its economic damages), while Mrs. Ashby is limited to seeking a remedy in arbitration that includes all of her economic damages (in whatever amount), and an award of punitive and other damages that totals no more than five times her economic damages.
[24] The Supreme Court of the United States' reasoning in State Farm Mutual Automobile Insurance Co. v. Campbell, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003), which like this case is a bad-faith case against an insurance company, suggests that a clause limiting the amount of punitive damages to no more than five times the amount of economic damages is not unconscionable as a limit on the amount of punitive damages that may be awarded. The Supreme Court stated:

"Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process. In [Pacific Mutual Life Insurance Co. v.] Haslip, [499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991),] in upholding a punitive damages award, we concluded that an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety. 499 U.S. at 23-24, 111 S.Ct. 1032. We cited that 4-to-1 ration again in [BMW of North America, Inc. v.] Gore, 517 U.S. [559], 581, 116 S.Ct. 1589 [(1996)]. The Court further referenced a long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish. Id. at 581, and n. 33, 116 S.Ct. 1589. While these ratios are not binding, they are instructive."
538 U.S. at 425, 123 S.Ct. at 1524.
[25] I would imagine that every lender requires that borrowers repay their loans in full, on time, and with some interest charge. The fact that borrowers do not have a "meaningful choice" but to agree to repay loans in full, on time, and with interest does not make loan agreements unconscionable. Similarly, all loan contracts contain an express or implied forum-selection clause. For this Court to hold that an arbitration clause in a loan agreement is unconscionable merely because all lenders in some geographic area incorporate the same choice of forum clause in their loan contractsin this case a forum-selection clause that prefers an arbitral forumwould run afoul of the express holding of the Supreme Court of the United States in Doctor's Associates, 517 U.S. at 687, 116 S.Ct. 1652, that arbitration clauses may not be treated differently from any other contract provision; unless, that is, this Court intends to treat as unconscionable all provisionsand not just arbitration clausesthat are standard in a particular industry.